BUCHALTER
A Professional Corporation
OREN BITAN (SBN: 251056)
WEISS B. HAMID (SBN: 300792)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
E-mail: obitan@buchalter.com

Attorneys for Plaintiff, Mammoth Rx, Inc.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAMMOTH RX, INC., a Delaware corporation, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. Fraudulent Misrepresentation; |
| FRED BATTAH aka FREDDY BATTAH, an individual; REAL VALUE PRODUCTS CORPORATION dba HOSPITAL PHARMACEUTICAL CONSULTANTS, a Texas corporation; and DOES 1 through 20, inclusive, | 2. Negligent Misrepresentation; |
| | 3. Intentional Interference with Contract; |
| | 4. Intentional Interference with Prospective Economic Relations; |
| | 5. Negligent Interference with Prospective Economic Relations; and |
| Defendants. | 6. Breach of Contract |

Plaintiff Mammoth Rx, Inc., a Delaware corporation ("Mammoth" or "Plaintiff"), complaints and alleges against defendants Fred Battah, and Real Value Products Corporation dba Hospital Pharmaceutical Consultants, as follows:

## NATURE OF ACTION

1. This action arises out of defendant Fred Battah, and Real Value Products Corporation's deception, fraud, and breach of contract against Mammoth, in violation of California common law, and California Bus. & Prof. Code § 17200, *et. seq.* Mammoth seeks damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief associated with its causes of action.

## THE PARTIES

2. Plaintiff MAMMOTH RX, INC. is a Delaware corporation authorized to do and doing business in the State of California. At all times relevant hereto, Plaintiff maintained its principal place of business in the County of Los Angeles, State of California.

3. Plaintiff is informed and believes, and on that basis alleges, that defendant FRED BATTAH, aka FREDDY BATTAH ("Battah"), is an individual who is and at all times herein mentioned was a resident of Bexar County, Texas. Plaintiff is further informed and believes and thereon alleges, that Battah regularly conducts business within the state of California.

4. Plaintiff is informed and believes, and on that basis alleges, that defendant REAL VALUE PRODUCTS CORPORATION dba HOSPITAL PHARMACEUTICAL CONSULTANTS ("Real Value") (collectively referred to with Battah as "Battah Defendants") is and at all times relevant hereto was a Texas corporation that regularly conducts business within the state of California.

5. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 20 inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true

A PROFESSIONAL CORPORATION
LOS ANGELES

2
**COMPLAINT**
BN 36255278v1

names and capacities, when ascertained. Plaintiff is informed and believes, and thereon alleges that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

6. At all times mentioned herein, Defendants, and each of them, were the agents, servants and employees of the remaining Defendants, and of each other and that at all times mentioned herein, Defendants and each of them were acting with the knowledge of each other and within the course and scope of their agency or employment, as applicable.

7. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Real Value and Battah each constitute the alter ego of the other by virtue of the manner of operation of the businesses of Real Value in that, at all relevant times, (i) there existed and now exists such a unity of interest and ownership between said Defendants such that the individuality and separateness of said Defendants has ceased, and despite knowledge thereof, Battah has acquiesced in and agreed and consented to and ratified such conduct as herein alleged such that adherence to the fiction of said Defendants' separate existence would, under the circumstances, promote injustice and fraud; (ii) said Defendants have been but an instrumentality or conduit of one another in the pursuit of a single business venture, and disregard of the separate nature of said Defendants is necessary to prevent an injustice to Mammoth; and (iii) said Defendants have committed, *inter alia*, the following acts:

   a. Plaintiff is informed and believes, and on that basis alleges, that Battah is the only shareholder, sole director, and/or sole manager of Real Value;

   b. Plaintiff is informed and believes, and on that basis alleges, that Battah conducted himself and Real Value in a manner such that the interests of Real Value were the same as the interests of Battah, by treating the companies' assets as his own and not that of the companies, improperly manipulating the companies' assets

for his benefit and to the detriment of his creditors, intermingling his own assets with the companies', and guaranteeing and paying the debts incurred by himself personally with the companies' assets, and vice versa;

  c. Plaintiff is informed and believes, and on that basis alleges, that Defendants violated corporate formality requirements, as required by law, including the California Corporations Code, to maintain the separate existences of Real Value from Battah;

  d. Plaintiff is informed and believes, and on that basis alleges, that Battah directed the actions of and made the decisions on behalf of Real Value as the only shareholder, director, manager, and officer of each company;

  e. Plaintiff is informed and believes, and on that basis alleges, that Battah completely controlled, dominated, managed, and operated Real Value such that the company was, and are nothing more than, a sham, shell instrumentalities through which Battah carries on his personal business; and

  f. Plaintiff is informed and believes, and on that basis alleges, that if either Real Value's acts were treated as their acts alone, this would have the inequitable result of Plaintiff enforcing the Agreement (as defined herein below) against shell entities, thereby denying Plaintiff the benefit of its bargain under both agreements.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this case pursuant to jury because there is diversity among the parties and the amount in controversy, without interest and costs, exceeds $75,000.

9. This Court has personal jurisdiction over Battah and Real Value because they are present, doing business and/or residing in this District, because they have committed tortious acts and violated Mammoth's rights in this District, and they knew or should have known that such conduct would cause injury to Mammoth in the State of California.

10. Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b) and 1391(c).

## FACTUAL ALLEGATIONS

11. Mammoth is, and at all times relevant hereto was, a sales distributor that markets, offers to sell, and distributes pharmaceutical products and medical devices. Plaintiff's goal is to reach patients worldwide with innovative pharmaceutical products and medical devices. To achieve that goal, Plaintiff regularly maintains strategic relationships with existing pharmaceutical companies which it believes to be capable of achieving that vision. Plaintiff's relationships with these customers are the bedrock of its company, and vital in order to keep its business afloat.

12. Mammoth had approximately fifty one (51) pharmaceutical clients. Each of these clients had contracts – either express or oral – with Mammoth whereby Mammoth would be the exclusive seller for their inventory.

13. The Battah Defendants are wholesale distributors that are Verified-Accredited Wholesale Distributors issued by the National Association of Boards of Pharmacy as a distributor of pharmaceutical products.

14. Mammoth had an existing wholesaler, however issues arose between the wholesaler with respect to fulfilling orders.

15. On or around July 2018, Battah spoke with Ryan Hilton over the phone about the potential for a partnership. Battah induced Mr. Hilton to switch from the prior wholesaler to the Battah Defendants, indicating that they would fulfill orders much more efficiently. Mammoth (the name of Hilton's entity) would connect the Battah Defendants with Mammoth's pharmaceutical clients, who would purchase inventory from Battah. Mammoth's clients would use an application programming interface ("API"), which allowed Mammoth to track inventory and purchases. The API software also allowed customers to order inventory all from one location, making purchases easy for the customers.

16. The parties orally agreed to a partnership in July 2018, and Ryan Hilton would create and launch Mammoth in November 1, 2018 (the "Agreement"). The parties were also planning on executing a written partnership around that time as well.

17. On August 15, 2018, Battah represented to Mr. Hilton over the phone that he was the only distributor of a product called Fenoprofen 200mg and 400mg and Chlorzoxazone ("Fenoprofen"). Battah made a similar representation to a pharmaceutical client of Mammoth's on August 23, 2018. It was later revealed that not only did other distributors carry Fenoprofen, but also sold it for a much lower price. As a result of this misrepresentation, Mammoth lost this pharmaceutical client and lost profits from this client.

18. The Battah Defendants, however, conducted numerous activity to stall the launch of Mammoth. Specifically, Battah represented to Mr. Hilton that Mammoth's pharmaceutical clients would have to fill out a credit application prior to engaging in any business with Battah. Once Mammoth's pharmaceutical clients began submitting these credit applications, Battah rejected the applications on the basis that the application would need a wet-ink signature. Once Mammoth's pharmaceutical clients submitting the wet-ink executed credit applications, Battah indicated – for the first time – that the clients would need to obtain a Drug Enforcement Administration certification – even though Mammoth was not distributing any controlled substances, and even if it was, Battah didn't have a coltrolled license to ship controlled substances. There was no point of obtaining a DEA certificate.

19. As a result of Battah's constant stalling and excuses, Mammoth delayed until January of 2019 before it had its soft launch.

20. During this time about twenty three of Mammoth's pharmaceutical clients began requesting for quotation ("RFQ") and purchasing the Battah Defendants' inventory through the API. Through Battah's oral representations,

21. Mammoth is informed and believes, and on that basis alleges, that on or around February 26, 2019, the Battah Defendants shut down the API system. With that system being cut, Mammoth was unable to track sales between its clients and the Battah Defendants.

22. Mammoth is informed and believes, and on that basis alleges, that the Battah Defendants began doing business directly with Mammoth's pharmaceutical clients, and inducing those clients to breaching their exclusivity agreements with Mammoth. Specifically, a Mammoth pharmaceutical client Heartland Pharmacy contacted Mammoth on March 6, 2019 through email indicating that the API was "blocked by Real Value" and that a Battah Defendants representative contacted Heartland Pharmacy directly for orders.

23. When Mr. Hilton confronted Battah regarding these actions on or around March 2019, Battah orally represented to Mr. Hilton that he will no longer abide by the Agreement as a result of a pending lawsuit concerning Mammoth's ability to sell certain items. This, however, was a false pretense for the Battah Defendants' true motivation: stealing Mammoth's pharmaceutical company clients in hopes to cut Mammoth out of the Agreement.

24. Plaintiff is informed and believes, and on that basis alleges, that the Battah Defendants, specifically Battah, spoke with Mammoth's pharmaceutical clients and falsely indicated that Mammoth was being investigated by the Federal Bureau of Investigation ("FBI") in order to create uncertainty in Mammoth and Ryan Hilton, thus harming those relationships.

25. Since the API has been cut, many clients have complained regarding inconveniences regarding purchasing inventory, which has substantially interfered with Plaintiff's relationships with these clients.

26. The result of Battah Defendants' actions were devastating to Mammoth. Plaintiff is informed and believes, and on that basis alleges, that the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

7
**COMPLAINT**

BN 36255278v1

Battah Defendants have now stolen approximately fifty one (51) of Mammoth's pharmaceutical clients. Because of this, Mammoth had to shutter its doors, shut down, and lay off most of its employees.

27. Because of the Battah Defendants' actions, Mammoth's relationship with the customers listed in the Agreement has been seriously disrupted.

## FIRST CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

28. Plaintiff incorporates by reference paragraphs 1 through 27, inclusive of this Complaint, as though fully set forth herein.

29. As set forth above, the Battah Defendants knowingly and/or recklessly made false representations of material facts for the purpose of inducing Mammoth's reliance thereon including, but not limited to, the following:

   a. That the Battah Defendants were interesting in a mutually beneficial partnership;
   b. That the Battah Defendants had good intentions with respect to requiring certifications and a "wet-ink" signature for credit applications;
   c. That the delays in launching Mammoth were done in good faith;
   d. That Mammoth is being investigated by the FBI to Mammoth's clients in order to create uncertainty in Mammoth;
   e. That the Battah Defendants were going to allow Mammoth to retain its clients; and
   f. That they were the exclusive distributor of Fenoprofen.

30. These representations were made in person during July 2018, prior to the Agreement, as well as various other conversations both written and oral.

31. These representation made by the Defendants were in fact false. Unbeknownst to Mammoth at the time, the true facts were:

a. The Battah Defendants had no interest in engaging in a partnership with Mammoth, and just sought to steal Mammoth's pharmaceutical clients;

b. That Mammoth was not being investigated by the FBI;

c. That the requirements for various certifications and applications, as well as the delays were simply a means to stall Mammoth as the Battah Defendants were stealing Mammoth's pharmaceutical companies; and

d. That not only were the Battah Defendants not the exclusive distributor of Fenoprofen, other distributors sold it for a much lower price.

32. When the Battah Defendants made these false representations, they knew them to be false and made these representations with the intention to deceive and defraud Mammoth to act in reliance on these representations in the manner hereafter alleged, or with the expectation that it would so act.

33. Mammoth, at the time these representations were made by the Battah Defendants and at the time Mammoth took the actions herein alleged, was ignorant of the falsity of the Battah Defendants' representations and believed them to be true. In reliance on these representations, Mammoth was induced to and did agree to engage with the Battah Defendants and shared their client list. Had Mammoth known the actual facts, Mammoth would not have taken such actions. Mammoth's reliance on the Battah Defendants' representations was justified because the Battah Defendants made the representations in connection with their efforts to convince Mammoth to engage in a mutually beneficial partnership.

34. As a proximate result of the fraudulent conduct of the Battah Defendants as herein alleged, Mammoth was induced engage in the partnership where it inevitably had all of its clients stolen by the Battah Defendants. The Battah Defendants' conduct also damaged Mammoth by forcing it to shut down and lay off employees, and more that is capable of proof at trial.

35. The Battah Defendants' misrepresentations of material facts were intentional, deceitful, and done with the intention to deprive Mammoth of its clients and legal rights, forcing it to be subject to undue hardship, and done in conscious disregard of Mammoth's rights, so as to justify an award of exemplary and punitive damages.

## SECOND CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
(**Against All Defendants**)

36. Plaintiff incorporates by reference paragraphs 1 through 35 inclusive of this Complaint, as though fully set forth herein.

37. As set forth above, the Battah Defendants knowingly and/or recklessly made false representations of material facts for the purpose of inducing Mammoth's reliance thereon including, but not limited to, the following:

    a. That the Battah Defendants were interesting in a mutually beneficial partnership;

    b. That the Battah Defendants had good intentions with respect to requiring certifications and a "wet-ink" signature for credit applications;

    c. That the delays in launching Mammoth were done in good faith;

    d. That Mammoth is being investigated by the FBI to Mammoth's clients in order to create uncertainty in Mammoth;

    e. That the Battah Defendants were going to allow Mammoth to retain its clients; and

    f. That they were the exclusive distributor of Fenoprofen.

38. These representations were made in person during July 2018, prior to the Agreement, as well as various other conversations both written and oral.

39. When Defendants made these false representations, they had no reasonable grounds for believing them to be true in that:

   a. The Battah Defendants had no interest in engaging in a partnership with Mammoth, and just sought to steal Mammoth's pharmaceutical clients;
   b. That Mammoth was not being investigated by the FBI;
   c. That the requirements for various certifications and applications, as well as the delays were simply a means to stall Mammoth as the Battah Defendants were stealing Mammoth's pharmaceutical companies; and
   d. That not only were the Battah Defendants not the exclusive distributor of Fenoprofen, other distributors sold it for a much lower price.

40. Defendants made these representations with the intention of inducing Mammoth to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Mammoth would so act.

41. Mammoth, at the time these representations were made by the Battah Defendants and at the time Mammoth took the actions herein alleged, was ignorant of the falsity of the Battah Defendants' representations and believed them to be true. In reliance on these representations, Mammoth was induced to, did agree to engage with the Battah Defendants, and shared their client list. Had Mammoth known the actual facts, Mammoth would not have taken such actions. Mammoth's reliance on the Battah Defendants' representations was justified because the Battah Defendants made the representations in connection with their efforts to convince Mammoth to engage in a mutually beneficial partnership.

42. As a proximate result of the fraudulent conduct of the Battah Defendants as herein alleged, Mammoth was induced engage in the partnership where it inevitably had all of its clients stolen by the Battah Defendants. The Battah Defendants' conduct also damaged Mammoth by forcing it to shut down and lay off employees, and more that is capable of proof at trial.

# THIRD CAUSE OF ACTION
# INTENTIONAL INFERENCE WITH CONTRACT
## (Against All Defendants)

43. Mammoth incorporates by reference paragraphs 1 through 42, inclusive of this Complaint, as though fully set forth herein.

44. Mammoth was a party to sales agreement, which was a valid contract for the sale of its products in which the third-party pharmaceutical clients were able to purchase products.

45. Defendants were aware of these sales agreements and the benefits that Plaintiff would receive from the full performance of the sales agreements.

46. Defendants intentionally interfered with those sales agreements by unlawfully making false representations concerning Mammoth, as well as soliciting Mammoth's clients knowing that Mammoth had exclusive deals with these clients.

47. Furthermore, the Battah Defendants interfered with sales agreements by, and not limited to: falsely telling other clients of Plaintiff that the FBI was investigating Mammoth in order to create uncertainty in Mammoth, thus harming those relationships, and cutting off Plaintiff's API, which has substantially interfered with Plaintiff's client relationships.

48. As a direct and proximate result of Defendants' intentional interference with the sales agreements, Plaintiff's performance of the sales agreement will be near impossible. Accordingly, Plaintiffs have suffered substantial damages in an amount according to proof at trial but in excess of $1,000,000. Further, Plaintiff is entitled to injunctive relief to restrain and enjoin the Defendants from further acts of unlawful conduct.

///

///

///

# FOURTH CAUSE OF ACTION
# INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
## (Against All Defendants)

49. Plaintiff incorporates by reference paragraphs 1 through 48, inclusive of this Complaint, as though fully set forth herein.

50. Plaintiff was in an economic relationship with third-party pharmaceutical companies, granting them exclusive rights to sell products.

51. Defendants were aware of the economic relationship when they decided to cut out Mammoth and solicited those clients directly.

52. By doing so, Defendants explicitly sold the Product with the intention to disrupt Plaintiff's business, or at least knew that disruption of the relationship was substantially certain to occur.

53. The Battah Defendants interfered with Mammoth's sales agreements by, and not limited to: falsely telling other clients of Plaintiff that Mammoth was being investigated by the FBI in order to create uncertainty in Mammoth, thus harming those relationships and cutting off Plaintiff's API which has substantially interfered with Plaintiff's client relationships, and directly soliciting Mammoth's clients to breach their agreements.

54. As a direct and proximate result of Defendants' action, Plaintiff's relationship with a third-party distributor has been disrupted. Accordingly, Plaintiffs have suffered substantial damages in an amount according to proof at trial but in excess of $600,000. Further, Plaintiff is entitled to injunctive relief to restrain and enjoin the Defendants from further acts of unlawful conduct.

///

///

///

## FIFTH CAUSE OF ACTION
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
### (Against All Defendants)

55. Mammoth incorporates by reference paragraphs 1 through 54, inclusive of this Complaint, as though fully set forth herein.

56. Mammoth was in an economic relationship with the third-party pharmaceutical clients, which resulted in future economic benefit to Mammoth.

57. Defendants were, or should have known, of this economic relationship.

58. Defendants knew, or should have known, that soliciting to Mammoth's current clients, as well as cutting off the API would be disruptive, thus failing to act with reasonable care.

59. As a direct and proximate result of Defendants' action, Mammoth's relationship with the third-party distributor has been disrupted. Accordingly, Mammoth has suffered substantial damages in an amount according to proof at trial but in excess of $1,000,000.

## SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against Battah Defendants)

60. Plaintiff incorporates by reference paragraphs 1 through 59, inclusive of this Complaint, as though fully set forth herein.

61. The Agreement constitutes a valid oral contract between the parties.

62. The Agreement provides that Mammoth has exclusive relationships with its pharmaceutical clients, and would use the API to connect those clients to the Battah Defendants' inventory.

63. Mammoth has performed all of its obligations presently due and owing under the Agreement except for those obligations excused by the acts and omissions of Defendants as alleged herein.

64. Events of default have occurred under the Agreement, including but not limited to cutting the API and selling products directly to Mammoth's exclusive pharmaceutical companies.

65. As a proximate result of these actions, Mammoth has been denied the benefit of the bargain it negotiated for in the Agreement. Specifically, Mammoth has lost nearly all of its pharmaceutical clients. Due to these breaches, relationships with clients have been materially disrupted. As such, Mammoth is unable to engage in any sales of its products to current and prospective third parties due to the API being cut by the Battah Defendants.

66. As a proximate result of these actions, Mammoth has also suffered incidental damages in an amount to be proven at trial but in any event no less than $1,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully pray for the following relief:

1. For compensatory damages in an amount according to proof at trial;
2. For interest on the amount of compensatory damages according to proof;
3. For punitive damages according to proof;
4. For injunctive relief according to proof;
5. For any further relief as the Court may deem proper.

DATED: April 24, 2019

BUCHALTER
A Professional Corporation

By: */s/ Oren Bitan*
OREN BITAN
WEISS B. HAMID
Attorneys for Plaintiff MAMMOTH RX, INC.

## **JURY TRIAL DEMAND**

Plaintiff Mammoth Rx, Inc. demands a trial by jury on all issues so triable in this matter.

DATED: April 24, 2019

BUCHALTER
A Professional Corporation

By: */s/ Oren Bitan*
OREN BITAN
WEISS B. HAMID
Attorneys for Plaintiff MAMMOTH RX, INC.